**RECORD NO. 13-4249**

# IN THE
# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JEAN BROWN,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

(The Honorable William D. Quarles, Jr., District Court Judge)

**OPENING BRIEF OF APPELLANT
JEAN BROWN**

Gary E. Proctor
LAW OFFICES OF
  GARY E. PROCTOR, LLC
8 East Mulberry Street
Baltimore, Maryland 21202
(410) 444-1500 Telephone
(866) 230-4455 Facsimile
gary_proctor@verizon.net

*Counsel for Appellant*                                    November 4, 2013

LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia  23219 (804) 644-0477
A Division of Lantagne Duplicating Services

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

Table of Authorities.................................................................. iii

Statement of Subject Matter Jurisdiction and
Basis for Appellate Jurisdiction  ...............................................1

Statement of the Issues..............................................................1

Statement of the Case ...............................................................2

Statement of Facts  ...................................................................3

Summary of the Argument  ......................................................16

Argument..................................................................................17

I.    WHETHER THE PRESENTATION OF EVIDENCE TO THE JURY
      OUTSIDE THE PRESENCE OF THE TRIAL JUDGE TO RULE ON
      ANY OBJECTIONS WAS STRUCTURAL ERROR REQUIRING A NEW
      TRIAL

      A.    Standard of Review.................................................17

      B.    The Court's Failure to Preside Over Appellant's Trial While the Jury
            Conducted an On-The-Record Review of Appellant's Inculpatory
            Video-Taped Statements Was Structural Error Because the Court
            Effectively Abdicated Control of the Judicial Process to the
            Courtroom Deputy ................................................17

II.   WHETHER THE COURT ERRED IN ALLOWING MS. BROWN'S
      STATEMENTS INTO EVIDENCE WHEN SAID ADMISSIONS WERE
      PROCURED WITHOUT THE EFFECTIVE ASSISTANCE OF
      COUNSEL

      A.    Standard of Review.................................................22

i

B.    Allowing Ms. Brown's statements in, which were procured without the effective assistance of counsel, constituted reversible error............22

III.  WHETHER FACTS THAT TRIGGERED A MORE SEVERE MAXIMUM AND MINIMUM SENTENCE WERE FOUND BY A JURY BEYOND A REASONABLE DOUBT

A.    Standard of Review ................................................................28

B.    Argument .............................................................................28

Conclusion ................................................................................30

Request for Oral Argument ...........................................................30

Certificate of Compliance with Typeface and Length Limitations .........................31

Certificate of Service ...................................................................32

# TABLE OF AUTHORITIES

## CASES

*Alleyne v. United States,*
    133 S. Ct. 2151 (2013)..................................................................28

*Apprendi v. New Jersey,*
    530 U.S. 466 (2000)..............................................................17, 28

*Arizona v. Fulminante,*
    499 U.S. 279 (1991)..............................................................17, 23

*Blackburn v. Alabama,*
    361 U.S. 199 (1960)..................................................................23

*Chapman v. California,*
    386 U.S. 18 (1967)....................................................................19

*Gomez v. United States,*
    490 U.S. 858 (1989)..................................................................19

*In re J.B.,*
    618 A.2d 1329 (Vt. 1992)..........................................................26

*Lafler v. Cooper,*
    132 S. Ct. 1376 (2012)..............................................................25

*Lego v. Twomey,*
    404 U.S. 477 (1972)..................................................................22

*Miller v. Fenton,*
    474 U.S. 104 (1985)..................................................................22

*Miranda v. Arizona,*
    384 U.S. 436 (1966)......................................................23, 24, 28

*Missouri v. Frye,*
    132 S. Ct. 1399 (2012)..............................................................25

*Moran v. Burbine*,
  475 U.S. 412 (1986)........................................................................25

*Neder v. United States*,
  527 U.S. 1 (1999)...........................................................................18

*Phelps v. State*,
  435 So. 2d 158 (Ala.Cr.App. 1983).................................................26

*Reck v. Pate*,
  367 U.S. 433 (1961)........................................................................23

*Riley v. Deeds*,
  56 F.3d 1117 (9th Cir. 1995) ..........................................................20

*Shneckloth v. Bustamonte*,
  412 U.S. 218 (1973)........................................................................22

*Strickland v. Washington*,
  466 U.S. 668 (1984)..................................................................25, 26

*Sullivan v. Louisiana*,
  508 U.S. 275 (1993)........................................................................17

*Tumey v. State of Ohio*,
  273 U.S. 510 (1927)................................................................... 18-19

*United States v. Blake*,
  571 F.3d 331 (4th Cir. 2009) ..........................................................22

*United States v. Braxton*,
  112 F.3d 717 (4th Cir. 1991) ..........................................................22

*United States v. Curbelo*,
  343 F.3d 273 (4th Cir. 2003) ..........................................................17

*United States v. Gadsden*,
  215 Fed. Appx. 283, 285 (4th Cir. 2007) ........................................23

*United States v. Goodwin*,
    531 F.2d 347 (6th Cir. 1976) ..........................................................27

*United States v. Jackson*,
    201 U.S. App. D.C. 212, 627 F.2d 1198, 1211 (D.C. Cir. 1980)....................24

*United States v. Kimbrough*,
    477 F.3d 144 (4th Cir. 2007) ..........................................................22

*United States v. Mackins*,
    315 F.3d 399 (2006) .....................................................................28

*United States v. Mortimer*,
    161 F.3d 240 (3rd Cir. 1998)......................................................19, 20

*United States v. Pleasants*,
    71 F. App'x 182, 184 (4th Cir. 2003) .............................................21

## STATUTES

18 U.S.C. § 2 ...............................................................................2
18 U.S.C. § 1959(a)(1)....................................................................2
18 U.S.C. § 1959(a)(5)....................................................................2
18 U.S.C. § 3231 ...........................................................................1
21 U.S.C. § 841 ...........................................................................29
21 U.S.C. § 841(a)(1)......................................................................2
28 U.S.C. § 1291 ...........................................................................1

## UNITED STATES CONSTITUTIONAL AMENDMENTS

United States Amend V ...............................................................23

United States Amend VI ...................................................23, 25, 28

## STATEMENT OF SUBJECT MATTER JURISDICTION AND BASIS FOR APPELLATE JURISDICTION

Jean Brown (hereafter "Ms. Brown" or "Appellant") appeals from the final judgment of conviction and sentence from the United States District Court for the District of Maryland. The United States District Court for the District of Maryland was the court of original subject matter jurisdiction pursuant to 18 U.S.C. § 3231. On March 27, 2013, the district court entered a judgment of conviction against Appellant, and a timely Notice of Appeal was filed on March 28, 2013.

The United States Court of Appeals for the Fourth Circuit has jurisdiction of the appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

WHETHER THE PRESENTATION OF EVIDENCE TO THE JURY OUTSIDE THE PRESENCE OF THE TRIAL JUDGE TO RULE ON ANY OBJECTIONS WAS STRUCTURAL ERROR REQUIRING A NEW TRIAL

WHETHER THE COURT ERRED IN ALLOWING MS. BROWN'S STATEMENTS INTO EVIDENCE WHEN SAID ADMISSIONS WERE PROCURED WITHOUT THE EFFECTIVE ASSISTANCE OF COUNSEL

WHETHER FACTS THAT TRIGGERED A MORE SEVERE MAXIMUM AND MINIMUM SENTENCE WERE FOUND BY A JURY BEYOND A REASONABLE DOUBT

**STATEMENT OF THE CASE**

Appellant was charged by Fourth Superseding Indictment in:

Count One:    conspiracy to distribute and possess with intent to distribute 1,000 kilograms or more of marijuana in violation of 21 U.S.C. § 841(a)(1);

Count Two:    kidnapping in aid of racketeering activity in violation of 18 U.S.C. § 1959(a)(1), and aiding and abetting in violation of 18 U.S.C. § 2;

Count Three:    conspiracy to commit murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(5), and aid and abetting in violation of 18 U.S.C. § 2; and

Count Four:    murder in aid of racketeering activity in violation of 18 U.S.C. § 1959(a)(1), and aiding and abetting in violation of 18 U.S.C. § 2, as well as related forfeiture allegations.

On March 11, 2011, Ms. Brown appeared before the court for her initial appearance. On November 29, 2012, she was arraigned before the United States District Court of Maryland and pleaded not guilty to each of the four counts charged in the Fourth Superseding Indictment. On February 4, 2013, Ms. Brown proceeded to trial, and, on February 19, 2013, the jury returned a verdict finding Ms. Brown guilty on each count.

Ms. Brown was sentenced to a term of life on Count One, a term of life on Count Two to run concurrently with count one, a term of life on Count Four to run concurrently with counts one and two, and a term of 120 months on Count Three to run concurrently with counts one, two and four.

2

Appellant thereafter filed a Notice of Appeal, and this timely appeal follows.

## STATEMENT OF FACTS

Appellant went to trial with her co-defendant Mr. Gabrial Campa-Mayen. The other nine (9) co-defendants entered into guilty pleas, and many cooperated with the Government. Mr. Campa-Mayen was eventually acquitted by jury verdict of the only charge he faced - conspiracy to distribute 1,000 kilograms of marijuana with Appellant and others. Charges 2, 3, and 4 concerned the murder of a Michael Knight.

At trial, evidence was presented in support of the marijuana conspiracy to show that Appellant, Mr. Campa-Mayen, and their co-conspirators, participated in a broad marijuana distribution chain whereby marijuana was purchased from a Mexican source of supply in Arizona, and then trucked to Maryland for distribution.

The Government alleged that Appellant made large amounts of cash selling marijuana throughout the east coast. She remitted much of the cash she made back to the place of her birth: Jamaica. The case started with 2 couriers being arrested in Montego Bay, Jamaica with large amounts of cash that they claimed they were trafficking on behalf of Ms. Brown. Also present on that trip was Michael Knight. (J.A. 223; 259).

3

In December of 2009 Michael Knight was living with his sister. (J.A. 337). Mr. Knight disappeared, so his sister therefore filed a missing person's report. (J.A. 352). Mr. Knight was alleged to have stolen an amount of money in excess of $200,000 from Appellant's marijuana trafficking. (J.A. 445; 493). The Government alleged that Hubert Downer, Dean Myrie, Peter Blake, Carl Smith and Appellant were present when Mr. Knight was killed. Mr. Smith died prior to trial. Messrs. Downer, Blake and Myrie all testified as Government witnesses in the case at bar.

Mr. Knight was alleged to have been killed in an apartment in Essex, Maryland. (J.A. 494). When Peter Blake got to the apartment in Essex, he testified that Mr. Knight was already tied up. (J.A. 495). His eye was out of its socket. Id. He was being held in the bathroom. Mr. Blake threatened to shoot Mr. Knight if he did not return the money. (J.A. 498). He had a gun that he borrowed from Downer. (J.A. 487). Mr. Blake then alleged that when Mr. Knight did not tell them where the missing money was, Appellant said "well you have to kill him." (J.A. 498). Mr. Blake did not believe he could do this by himself, so he went and got Mr. Downer. (J.A. 499). When they returned, Mr. Knight did not respond to question about where the money was, so Appellant allegedly said "[k]ill him." (J.A. 503). She offered $100,000 for the murder. Id. Mr. Blake testified that "[Downer took] the big knife, and I take the small knife, and then I stabbed

4

Michael in his neck three to four times." (J.A. 504). Mr. Blake continued to stab

him in the back and then Mr. Downer "plunged the big knife in him, and he scream

out and then, when he scream out, he was reeling up, and we hold him down, and

then we see him stop move and then I go to Jean, and I said to her - - I said, 'He's

dead.'" (J.A. 505). Mr. Downer disagreed: stating that there was only one knife,

and Mr. Blake, and only Mr. Blake, used it. (J.A. 687).

Over the next few days, Mr. Knight's body was cut up into pieces and

deposited in various dumpsters around the Baltimore region. (J.A. 510 *et seq.*)

( J.A. 650 *et seq.*). Mr. Smith left for Arizona. (J.A. 507). Later crime scene

investigators found biological evidence from the apartment that was linked to Mr.

Knight. (J.A. 600).

Mr. Blake, Mr. Downer and Mr. Myrie also testified to Appellant trafficking

large amounts of marijuana. Id. Mr. Myrie also testified as to the conversation that

preceded Mr. Knight's death. (J.A. 867).    Several people connected with the

marijuana trucking and delivery testified such as Robert Henry (J.A. 767 *et seq.*),

Wilmot Kerr (J.A. 796 *et seq.*), Herbert Gentle (J.A. 905 *et seq.*), Jason Carnegie

(J.A. 957*et seq.*) and MoWayne McKay (J.A. 1011 *et seq.*).

Prior to the indictment in the instant case, Appellant was already in jail on a

Federal indictment on a bulk cash smuggling scheme, in connection with the

marijuana smuggling. She had attorney, whose name was Sebastian Cotrone. The

5

bulk cash smuggling carried a five (5) years statutory maximum.   (J.A. 99).
Throughout her incarceration on the bulk cash case, Appellant was never visited in
jail by Mr. Cotrone.  (J.A. 100).

Ms. Brown first sat down with agents on the date of her arraignment, with the
benefit of a proffer letter.[1]  (J.A. 100).  This did not go well, and Ms. Brown was
believed to have lied and been less than credible.  Id.    Following that, the
Government indicated that they were willing to speak to Ms. Brown again, but this
time it would not be subject to proffer protections. Mr. Cotrone was aware that the
charges on which Baltimore County homicide detectives wished to interview Ms.
Brown, carried only 2 possible punishments, life in prison or death.  (J.A. 99).  Mr.
Cotrone knew that Knight homicide was still open.  (J.A. 102).  Mr. Cotrone was
further aware that any future interviews conducted with Ms. Brown would be
without the benefit of a proffer letter and, as such, any statements made would
"come back to haunt her."  (J.A. 103).  Mr. Cotrone knew that with regard to the
murder of Michael Knight Appellant was "a potential defendant, and that the
investigation was of her."  (J.A. 105).  In short: Mr. Cotrone was aware that "Ms.
Brown remains a suspect."  (J.A. 121).

---

1   A proffer letter is a frequently used tool in the District of Maryland as well as,
no doubt, elsewhere, which provides a defendant some protections over what
they tell law enforcement.

Despite all of this, Mr. Cotrone allowed Ms. Brown to be interviewed twice more. Mr. Cotrone "never even got that specific [with Appellant] about [the murder of Michael Knight], but I never sat down with her and said, 'Listen, tell me about Michael Knight and all this.'" (J.A. 121-122).

The interviews, which took place on October 13, 2010, and November 3, 2011, were videotaped and contained many inculpating statements and admissions. Indeed, when the jury retired to deliberate the **only thing** they asked to review again was Appellant's statement.

Ms. Brown's guilty plea in the bulk cash case occurred on October 13, 2010. The court proceedings ended at 5:17 p.m. (J.A. 104). The interview with Baltimore County homicide detectives began at 7:25 p.m., some 2 hours later. Id. Despite only this two (2) hour gap, Mr. Cotrone was not present as he "went home [to Florida]." Id. Mr. Cotrone was not even available by telephone for much of this interview as "I was in the air, I'm not available by phone." Id. Mr. Cotrone did communicate with his client during the November 3rd proffer. (J.A. 106). This second proffer lasted some seven hours. (J.A. 107).

Over the objection of Appellant's counsel, several hours of videotaped interviews from October 13 and November 3, 2010 were introduced into evidence and played to the jury. (J.A. 396 – 416).

7

On February 13, 3013, following the conclusion of evidence, the court conducted a charging conference on the record with all parties present. Among the many issues discussed was whether kilograms and pounds would be simultaneously used to instruct the jury. The colloquy on this topic proceeded as follows:

> MR. CASSELLA: Your Honor, with Number 48, we just ask that the Court tell the jury that 1,000 kilograms equals 2,200 pounds, because the testimony had been in English units as opposed to metric units.
>
> THE COURT: We'll make that parenthetical.
>
> MR. PROCTOR: And, Judge, I don't have the exact version right, but I don't want some 2255 lawyer saying it was 2,200 point –
>
> THE COURT: One kilo is 2.2 pounds.
>
> **MR. PROCTOR: Exactly? There isn't a few ounces either way?**
>
> THE COURT: Exactly, I think. That's the one.
>
> **MR. PROCTOR: Well, if that's a correct statement of the law, we have nothing additional.**
>
> THE COURT: I think it's a correct statement on the measurement as well. Forty-nine, Government?

(J.A. 1692 – 1693). (emphasis added). The topic of pounds versus kilograms was again discussed in the context of the verdict form.

> MR. CASSELLA: [B]efore we leave the verdict form, Your Honor, but the same observation I made earlier about kilograms versus pounds, because the instruction is going to give them the equivalent, perhaps the special verdict form could also include the equivalent?

8

> THE COURT: Okay. In the first reference, which is 1(b) on the Jean Brown form, after the first reference to 1,000 kilograms, we will include a parenthetical of 220 pounds. In the same place –
>
> MR. PROCTOR: 220, Judge?
>
> MR. CASSELLA: 2,200
>
> THE COURT: 2,200. Sorry. 2,200.
>
> MR. PROCTOR: Bar is low enough already.
>
> THE COURT: And, on the 1(b) in the second verdict form, it will also be 2,200 pounds.

(J.A.1715 - 1716). Far from an academic discussion among attorneys, the jury was so instructed via their verdict sheet, the government's counsel and even the court itself. (J.A. 1955)

The government presented a closing argument that emphasized the non-distinction between 1,000 kilogram and 2,200 pounds not less than three times. Government counsel first addressed the issue on the subject of what constitutes a legally sufficient amount of evidence:

> [w]hat we have to talk about next is exactly what it is these two defendants are charged with and what the Government has to prove beyond a reasonable doubt in order for justice to be done.
>
> Now, you'll be told that the Indictment contains just four counts. The first is conspiracy to distribute more than a thousand kilograms, **which is the same as 2,220 pounds** – a conspiracy to distribute more than a thousand kilograms of marijuana.

(J.A. 1734).     The government reiterated that "[t]here is no doubt -- none -- that

9

Jean Brown ran a drug conspiracy out of Maryland that involved more than 2,200 pounds or a thousand kilograms of marijuana, and therefore is guilty of Count One." (J.A. 1739). And finally, in rebuttal, the government appealed directly to the verdict sheet. "On Count One for Ms. Brown, we'll ask you to circle 'guilty' as to where or not she was a member of a conspiracy. And the amount of marijuana, well over a thousand kilograms. This is 2,200 pounds, but well over a thousand kilograms." (J.A. 1856).

The following day, on February 14, 2013, the court instructed the jury on the law of the case. Here, the jury heard from the court that "[t]he purpose of the conspiracy charged in Count 1 was to distribute, or possess with intent to distribute, 1,000 kilograms -- that's 2,200 pounds -- or more of marijuana." (J.A. 1897).

After the jury retired to deliberate, it sent a note to the court that it wished to review a one-hour portion of the video of the November 3, 2010, interview. (J.A. 1932). The parties agreed that the request was permissible and the court promptly summoned the jury. (J.A. 1932). The following transpired in front of the seated jury

> MR. NOTHSTEIN: Your Honor, for the record, we'll be playing an excerpt previously played by the Government from the November 3rd interview. It starts at -- on the DVD, it's seven minutes. The end time of the second segment played was one hour, seven minutes.

10

MR. PROCTOR: What's the transcript page?

MR. NOTHSTEIN: The transcript page starts at 152.  That's the first page of the excerpts that we turned -- that we distributed.

(Whereupon, a portion of a video was displayed.)

MR. NOTHSTEIN: Your Honor, would the Court like a transcript?

THE COURT: No.

(Whereupon, a portion of a video continued to be displayed.)

MR. NOTHSTEIN: I'm going to speed it up a little bit, Your Honor.

(Whereupon, a portion of a video continued to be displayed.)

MR. NOTHSTEIN: Just for the record, Your Honor, where it began is 15 minutes, 35 seconds.

THE COURT: Thank you.

(Whereupon, a portion of a video continued to be displayed until 15:57.)

MR. NOTHSTEIN: Your Honor, I'll just pause it for a moment. I want to make sure I'm getting the right section.  This should be at Page 154, I believe it's going to be, Your Honor. Well, I'm sorry. Let me make sure that's correct.

MR. CASSELLA: What you just played was at the bottom of Page 153.

MR. NOTHSTEIN: All right. I believe it's 153, Your Honor.

(Whereupon, a portion of a video continued to be displayed from 15:57 to 16:11.)

MR. NOTHSTEIN: I'm sorry. We're on Page 154 now, Your Honor.

THE COURT: Thank you.

11

(Whereupon, a portion of a video continued to be displayed from 16:11 to 35:06.)

MR. NOTHSTEIN: Your Honor, for the record, paused at 35 minutes, six seconds.

THE COURT: Thank you.  Members of the jury, I have to step off for a brief period. The recording will continue to play in my absence, and Belinda [the courtroom deputy] will get me if I'm needed. Continue.

MR. NOTHSTEIN: And, Your Honor, I just didn't know if the Judge wanted to inquire if the jury wanted to see the entirety of this, or if there is a point at which they wanted to stop?

THE COURT: Do you still wish to continue watching?

JUROR 11: Yeah. We can signal --

THE COURT: Would you signal when you're ready to stop.

MR. NOTHSTEIN: Thank you.

THE COURT: Thank you.

MR. NOTHSTEIN: Mr. Giordano, we're resuming at 35 minutes, six seconds.

(Whereupon, a portion of a video continued to be displayed from 35:06 to 1:07:44.)

MR. NOTHSTEIN: For the record, I stopped at one hour, seven minutes, 44 seconds.

(Counsel conferring.)

THE CLERK: All rise. This Honorable Court now resumes in session.

THE COURT: Please be seated.

Members of the jury, have you seen enough? Do you wish additional tape? Do you wish to resume your deliberations?

12

JUROR 11: I think we need to discuss this for a bit. We may come back with another request -- we may not -- after we talk.

THE COURT: Very good. Please resume your deliberations. We await your return.

THE CLERK: All rise. This Honorable Court is now in recess pending return of the jury.

JUROR: Can we keep these?

MR. PROCTOR: No.

THE COURT: No. Please leave the transcripts here.

(Jury excused.)

THE COURT: Counsel and Defendants, please stay close. Don't leave the courtroom until about 2:30. I don't know where they are, but let's give them a chance to talk.  They indicated they wanted to talk, so there may be something they will need us for, so please hang around.

MR. PROCTOR: Judge --

THE COURT: Yes.

MR. PROCTOR: -- before you leave, I filed a motion for a mistrial while the jury was listening to that transcript. I believe the Court not being present while portions of the exhibits were played is structural error that requires no prejudice. I cited -- it came up for me one time before, so I had the case law near at hand, so there wasn't much argument in there, but I did cite the Court's -- the cases I'd like the Court to look at.

THE COURT: The motion was for a mistrial?

MR. PROCTOR: Right.

THE COURT: Motion is denied.

MR. PROCTOR: Thank you, sir.

THE COURT: Thank you.

THE CLERK: All rise. This Honorable Court stands in recess until return of the jury.

(J.A. 1934 – 1937).

In total, the court left the bench vacant for more than 30 minutes. During this time, the jury reviewed evidence in open court with all counsel present and clients remained at trial table before the seated jury. Counsel filed a motion for mistrial during this time. Mistrial Motion, (J.A. 1858 – 1860).

The jury returned its verdict on February 19, 2013. Reading from a signed verdict sheet, the jury foreperson announced the jury's factual findings in support of Count One.

THE CLERK:  How do you find the Defendant Jean Brown, not guilty or guilty, of the matters wherefore she stands indicted as to Count 1?

JURY FOREPERSON: Guilty.

THE CLERK: Okay. And what amount of marijuana was involved?

JURY FOREPERSON: 2,200 pounds.

THE CLERK: 2,200 pounds.

JURY FOREPERSON: Or more.

(J.A. 1946). Accord (J.A. 1955)

On March 22, 2013, Appellant appeared before the court for disposition. The parties proceeded with a mutual understanding that 2,220 pounds was actually 997

14

kilograms, and that the specific factual finding made by the jury was 2,200 pounds, not 1,000 kilograms.[2] (J.A. 1978).

The undersigned then presented argument to the court that, because 2,200 pounds is actually 997.903 kilograms, the court may not sentence Appellant according to the statutory maximum for 1,000 kilograms or more.

> Mr. PROCTOR:  There [are] two different things.  You could calculate the guidelines whatever way you wish.  … That's not what we objected to.  You can find whatever quantity you find.  Under Apprendi, to go from five to forty [years as the sentencing range] and then ten to life, that not something you can find.  That's something only a jury can find and find beyond a reasonable doubt.  That's why we have those graduated weights in the verdict form.

> THE COURT:  And the jury found it, and I'm saying that there is sufficient evidence in the record, either through money as a proxy, or through the testimony of various witnesses about actual sales, that the jury got it right.

> Mr. PROCTOR:  And where we're at is the jury didn't find it.  When the verdict was read in open court, the courtroom deputy said, 'What quantity,' and the jury said, '2,220 pounds.'  So what you heard from the jury is 997 kilograms, Your Honor, and you can't make that inferential three kilogram leap no matter how much you find from the testimony was testified to.  Under Apprendi, that would be a violation.  The statutory range is five to forty, the guidelines be what they may.

(J.A. 1977 – 1978).

---

2    It should be noted however, that the government pointed out that pounds measure weight and kilograms measure mass.  Insofar as the marijuana is measured on the Earth's surface, the difference between weight and mass are philosophical.

The court ultimately determined that 1,000 kilograms or more was supported by the evidence. (J.A. 1986).  Accordingly, the court imposed a term of life on Count One. (J.A. 1998).

## SUMMARY OF THE ARGUMENT

The legitimacy of Ms. Brown's conviction and subsequent sentence is materially undercut by structural error and constitutional defect.  With the United States District Court still in session, the trial judge vacated the bench while presiding over a courtroom in which a seated jury examined evidence with the adverse parties poised at their respective trial tables.  In the court's stead, the courtroom deputy was thereby appointed to "get me if I'm needed."  (J.A. 1936).

The district court erred in allowing into evidence Appellant's statements that were procured without the effective assistance of counsel.  Appellant, who faced a five (5) year statutory maximum for bulk cash smuggling, was allowed by her attorney to be examined by seasoned homicide detectives for approximately nine (9) hours, without the lawyer attending nor, for much of it, being available even by phone.  Simply put: no lawyer would do this.

Furthermore, Appellant's mandatory minimum sentence was doubled, and the maximum increased from forty (40) years to life, upon a fact that was not found by a jury, nor proven beyond a reasonable doubt.  According to the jury's

16

verdict, Appellant was convicted for conspiring to distribute 997 kilograms of marijuana. Appellant was sentenced for conspiring to distribute 1,000 kilograms of marijuana. The factual finding and resulting increase beyond the mandatory maximum violates *Apprendi v. New Jersey*, 530 US 466 (2000).

Both individually and collectively, these errors require a new trial.

## **ARGUMENT**

I.     THE PRESENTATION OF EVIDENCE TO THE JURY OUTSIDE THE PRESENCE OF THE TRIAL JUDGE TO RULE ON ANY OBJECTIONS WAS STRUCTURAL ERROR REQUIRING A NEW TRIAL

A.     Standard of Review

Structural defects in the constitution of the trial mechanism defy analysis by "harmless-error" standards because they are "necessarily unquantifiable and indeterminate." *United States v. Curbelo*, 343 F.3d 273, 278 (4th Cir. 2003) (citing *Sullivan v. Louisiana,* 508 U.S. 275, 281-82 (1993), *Arizona v. Fulminante,* 499 U.S. 279, 309 (1991)). Such errors always require invalidation of a judgment.

B.     The Court's Failure to Preside Over Appellant's Trial While the Jury Conducted an On-The-Record Review of Appellant's Inculpatory Video-Taped Statements Was Structural Error Because the Court Effectively Abdicated Control of the Judicial Process to Counsel

As indicated above, the jury asked to hear portions of Appellant's statements to law enforcement. The district court informed the "[m]embers of the jury, I have

to step off for a brief period. The recording will continue to play in my absence, and [the courtroom deputy] will get me if I'm needed."[3]  More than 30 minutes of recordings were played when the defendants were present, the Government, the case agent, the courtroom deputy, the jury, but no judge.  Moreover, the tapes had several gaps, so there were pauses as they were cued to the right part.  The Government read times and such into the record, all without the presence of a judge in the room[4].  It is Appellant's contention that this constitutes structural error, mandating a new trial.

Structural errors affect the very "framework within which the trial proceeds, rather than simply ... the trial process itself.' " *Neder v. United States,* 527 U.S. 1, 8 (1999). A long time ago it was settled that "[n]o matter what the evidence was against [Appellant], [s]he had the right to have an impartial judge." *Tumey v. State*

---

3  It is Appellant's belief that, while no reason was ever given either on or off the record, that the district court judge left the bench in the case at bar to conduct a sentencing in another unrelated case, in an adjacent courtroom.  See *United States v. Bae Soo Chon*, WDQ 12-0506, D. Md..  The docket therein shows that Mr. Chon was sentenced on the same date (February 14, 2013) using a court reporter other than the one ultilized in Appellant's trial.  Docket Entry 23 in WDQ 12-0506.  Mr. Chon received a sentence of a year and a day.  Ms. Brown's jury was hearing evidence that would result in 4 life sentences.

4  As the transcript indicates "(Counsel conferring.)" (J.A.1936). While admittedly wholly outside the record, it is the undersigned's recollection that we were conferring because none of us had any idea what to do because, to simply put, this **never happens**.  Nor should it.  Should counsel dismiss the jury?  Should we stare at them staring at us?  Collectively, no one had a clue.

*of Ohio*, 273 U.S. 510, 535 (1927).    Here, Appellant had **no judge**, whether impartial or otherwise.  The district judge's absence is one of those "constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error."  *Chapman v. California*, 386 U.S. 18, 23 (1967).  "Equally basic is a defendant's right to have all critical stages of a criminal trial conducted by a person with jurisdiction to preside."  *Gomez v. United States*, 490 U.S. 858, 876 (1989). This fundamental right was ignored in the case at bar.  With the jury in the room, in the presence of Appellant, reviewing evidence that the jury has deemed important, surely constitutes a critical stage.

A close facsimile to the case at bar is *United States v. Mortimer*, 161 F.3d 240 (3rd Cir. 1998).  In that case:

> Defense counsel had barely begun her summation when the prosecutor made an objection only to withdraw it with the exclamation, "The judge is not here." The judge, who had been present at all of the prosecutor's argument, had indeed disappeared. He had given no notice to counsel or the jury that he was about to depart. He was simply gone. No good reason or indeed any reason was given for his disappearance. He was back on the bench in time to thank defense counsel for her speech and call on the prosecutor for her rebuttal.

Id.  In granting a new trial due to structural error the Third Circuit stated that:

> A trial consists of a contest between litigants before a judge. When the judge is absent at a "critical stage" the forum is destroyed.  There is no trial. The structure has been removed. There is no way of repairing it. The framework "within which the trial proceeds" has been eliminated. The verdict is a nullity.

> We cannot, of course, anticipate every circumstance under which the judge's absence may destroy the structure. The structure normally stands if the parties consent to excuse the presence of a judge. No consent occurred here. Before whom was defense counsel to offer consent? That defense counsel continued her summation cannot be construed as consent. Was she to stop in midsentence as it were and wait for such time as the judge should reappear? She did her best under the circumstances but her carrying on in adversity cannot be turned into agreement to the judge's absence.

Id. at 241 (internal citations omitted).  In the case at bar, similarly, counsel did not consent.  There was no objection to be made, as there was no judge in the courtroom.  It cannot be said that counsel acquiesced:  he filed a Motion for a Mistrial during the trial judge's absence. (J.A. 1858 – 1860).  It was promptly raised with the court upon its return.   Counsel "did h[is] best under the circumstances."  Id.

A further doppelganger to the case at bar is *Riley v. Deeds*, 56 F.3d 1117 (9th Cir. 1995).  In that case:

> the jury asked the court to read back part of the trial testimony. The trial judge was not available to respond to the request. In his absence, and without any input from the judge, the jury was assembled in the courtroom with the defendant Riley, his lawyer, and the prosecuting attorney present. The judge's law clerk presided. At the jury's request, only the victim's direct testimony was read. Thereafter, the jury returned its verdict, convicting Riley of the charges against him.

Id. at 1118.  In that case *at least* the law clerk had some knowledge of, well, the law.  In Appellant's case there was not a single person with legal training in the courtroom who was unconnected to either side.  Nevertheless, the holding of the

20

Ninth Circuit was unequivocal:

> Suffice it to say that in this case there was a complete abdication of judicial control over the process. In this structural vacuum, a rule requiring the defendant to show prejudice, or one requiring the state to show lack of prejudice, makes no sense.
>
> Nor can we say, as the state urges, that by failing to make a timely objection Riley waived his right to object to the readback and to the trial judge's absence from the proceeding. It is true that no contemporaneous objection was made, but that is beside the point. There was no opportunity to make any meaningful objection. To whom would the objection have been made? The law clerk? No judge was present to hear the objection or rule on it.
>
> We conclude that the trial judge's absence during the readback of the victim's direct examination, coupled with the judge's failure to rule upon the jury's request for the readback, his failure to exercise any discretion over what testimony would be read, and his unavailability during the proceeding was structural constitutional error which requires automatic reversal of Riley's conviction.

Id. at 1121-22 (9th Cir. 1995).  Appellant made as contemporaneous an objection as could be made under the circumstances.  The argument is that much stronger here.[5]

The trial court's absence is structural error and requires reversal.

---

5   This case is distinguishable from *United States v. Pleasants*, 71 F. App'x 182, 184 (4th Cir. 2003) in which no objection was made and the parties were notified in advance by the court that "if I leave the bench, I will be in earshot, and if one of the lawyers should object to something that the other one says, they know to stop until I can come back into the courtroom and rule on whatever the objections might be."  Here the district court was not within earshot so, effectively, no objection could be made.

II.    THE COURT ERRED IN ALLOWING MS. BROWN'S STATEMENTS
       INTO EVIDENCE WHEN SAID ADMISSIONS WERE PROCURED
       WITHOUT THE EFFECTIVE ASSISTANCE OF COUNSEL

   A.    Standard of Review

   In reviewing the denial of a motion to suppress, this Court reviews factual

findings for clear error and legal conclusions de novo. *United States v. Blake*, 571

F.3d 331, 338 (4th Cir. 2009); *United States v. Kimbrough,* 477 F.3d 144, 147 (4th

Cir. 2007).

   B.    Allowing Ms. Brown's statements in, which were procured without
         the effective assistance of counsel constituted reversible error

   The Due Process Clause requires that any statement given to law

enforcement be voluntary.  *Shneckloth v. Bustamonte*, 412 U.S. 218 (1973).   The

burden is on the Government seeking to introduce the statement to prove by a

preponderance of the evidence that the statement was given voluntarily.   *Lego v.

Twomey*, 404 U.S. 477, 489 (1972). A challenge to the voluntariness of an

admission requires a court "to determine whether, under the totality of the

circumstances, the challenged confession was obtained in a manner compatible

with the requirements of the Constitution[.]" *Miller v. Fenton*, 474 U.S. 104, 112

(1985).  *See also, Schneckloth*, 412 U.S. at 225.

   A statement is involuntary if a suspect's will has been overborne in extracting

it from him.   *United States v. Braxton*, 112 F.3d 717, 780 (4th Cir. 1991).

22

Involuntariness may result from physical coercion, *Reck v. Pate*, 367 U.S. 433, 440 (1961), or psychological pressure. *United States v. Gadsden*, 215 Fed. Appx. 283, 285 (4th Cir. 2007). The Supreme Court has made clear that "a finding of coercion need not depend upon actual violence by a government agent; a credible threat is sufficient. As we have said, coercion can be mental as well as physical." *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991) (quoting *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960)). As the evidentiary hearing in this case evinced, the statements at issue resulted from unconstitutional ineffective assistance of counsel and a total breakdown of the Fifth and Sixth Amendments. Mr. Cotrone got on a flight, rather than drive 15 minutes up the road to attend an interview. While counsel should attend in every instance, Mr. Cotrone's absence was that much more egregious given his knowledge that his client was a suspect in, and would be questioned concerning, a homicide that carried a mandatory life or death sentence.

It is well-established that law enforcement officers engaged in custodial interrogation of a suspect are required to recite a prophylactic warning advising the suspect of his option to invoke his Fifth and Sixth Amendment rights. Prior to any questioning, the suspect must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney, either retained or appointed. *Miranda v. Arizona*, 384 U.S. 436, 344-45 (1966). Each case turns on an assessment of the

23

peculiar circumstances of the case." *United States v. Jackson*, 201 U.S. App. D.C. 212, 627 F.2d 1198, 1211 (D.C. Cir. 1980).  The question at bar here is whether, even when a *Miranda* warning is given, if it can be validly waived when said waiver resulted **only** from the defective advice of counsel.

Whenever custodial interrogation proceeds, a prerequisite to the later admissibility of any statements obtained thereafter is conditioned on the Government's ability to demonstrate that the accused "knowingly and voluntarily waived his or her privilege against self-incrimination and his or her right to retained or appointed counsel." Id. at 475.

Any inquiry into the voluntariness of an alleged *Miranda* waiver has two dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Id.  Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.  Id.  Here, Appellant, at a minimum, was unaware of the right being abandoned.

Whether counsel could render pretrial ineffective assistance of counsel, under

24

the familiar *Strickland* standard, used to be a topic of debate. *Strickland v.*

*Washington*, 466 U.S. 668, 686 (1984). The issue was recently laid to rest with the

Supreme Court decisions in *Lafler v. Cooper*, 132 S. Ct. 1376 (2012) and *Missouri*

*v. Frye*, 132 S. Ct. 1399 (2012). In those cases the holding is clear: "[d]efendants

have a *Sixth Amendment* right to counsel, a right that extends to the plea-bargaining

process." 132 S.Ct. at 1384. Of course the plea bargaining process is a pretrial

process. In the case at bar, there was to put it simply, no reason in the world that

Mr. Controne would voluntarily absent himself from the interrogation. The

undersigned has represented literally hundreds of defendants in the District of

Maryland and never, not once, has he advised his client to have an initial meeting

with law enforcement on a totally unrelated matter - - let alone a **homicide** - -

outside his presence, and in the absence of a proffer or immunity agreement. It is

patently obvious that Mr. Cotrone was asleep at the wheel. He was aware that no

proffer letter was provided. He did not seek immunity. He did not seek a

cooperation agreement. He simply told his client that she was free to implicate

herself in a homicide that carries a mandatory life sentence, all from the seclusion

of his Florida office.[6] To allow a client to all but confess to a homicide in the

hopes of obtaining a modest guideline adjustment in a case with a 60 month

---

[6] With regard to the materiality of Appellant's statements, see the Government's
    closing argument.

25

statutory maximum cannot be construed as a tactical decision, and strains credulity. There is no possible tactical reason to be, and remain, absent.[7]

The standard for showing deficient performance is if counsel's performance "fell below an objective standard of reasonableness." Failure to advise a client of the consequences of his decision to cooperate is deficient performance under the *Strickland* test. Erroneous, incomplete, or poor advise or consultation regarding an accused's pretrial silence may demonstrate and support a finding of inadequate assistance of counsel. *Phelps v. State*, 435 So.2d 158 (Ala.Cr.App. 1983). Here, as Cotrone readily admitted, he "never even got that specific [with Appellant] about [the murder of Michael Knight], but I never sat down with her and said, 'Listen, tell me about Michael Knight and all this.'" (J.A. 121 – 122).

Further supporting Appellant's arguments is the Supreme Court of Vermont. The case is *In re J.B.*, 618 A.2d 1329 (Vt. 1992), in which that court held that the defendant was denied effective assistance of counsel by the failure of the attorney to adequately represent him concerning his right to not be interviewed. The court held that the defendant's counsel wholly failed to act in his role as advocate. J.B.'s lawyer was at least present at the time of the interview. Mr. Controne was more

---

7    It matters not that Ms. Brown's statements were not procured because of some prosecutorial or police misconduct. If Ms. Brown had told her counsel that she was 100 miles away at the time of the homicide with 3 people, and counsel had failed to interview them, ineffective assistance can be rendered, and a new trial mandated, all without any malfeasance by the prosecution.

than 1000 miles away.  His reluctance to reschedule a flight led to the most damning evidence in the Government's possession and was fastened on to by the jury in returning a conviction.

A similar result was reached in *U.S. v. Goodwin*, 531 F.2d 347 (6th Cir. 1976). There the attorney advised the client to testify which resulted in the client clearly incriminating himself.  The advice was based on the belief that his testimony would "clear the whole thing up." The appellate court failed to see how a confession to a crime could clear anything up.  It held his counsel to be ineffective.

Mr. Cotrone had a duty to inform himself fully regarding the facts of Jean Brown's case, and the law applicable thereto, before he could advise Appellant on whether to cooperate. He abjectly failed to fully inform himself on the facts and law applicable thereto before Appellant was interviewed by the police. Therefore, Cotrone provided ineffective assistance of counsel.

The district court, in denying the motion to suppress, stated that because Ms. Brown did not have a right to counsel when questioned by Baltimore County homicide detectives, whether or not Mr. Cotrone was effective was of no moment. (J.A. 2036 – 2040).  Respectfully, the court entirely missed the point.  Whether or not Ms. Brown had a *right* to counsel, she clearly *had* counsel.  The Government made Mr. Cotrone aware that they wanted to question Appellant.  The police officers were aware of it.  So Ms. Brown had clearly invoked the protections of the

27

Sixth Amendment. The court's ruling, taken at face value, would change the *Miranda* warning to "you have a right to an attorney, however if you exercise that right there is no requirement that your attorney do anything of benefit to you or be awake during questioning." This surely cannot be, and is not, the case.

Mr. Cotrone's failure to render effective assistance of counsel both individually, and cumulatively with the other issues raised herein, mandates a new trial in this matter.

III.    FACTS THAT TRIGGERED A MORE SEVERE MAXIMUM AND MINIMUM SENTENCE WERE FOUND BY A JURY BEYOND A REASONABLE DOUBT

A.    STANDARD OF REVIEW

A timely and sufficient *Apprendi* sentencing objection made in trial court and thus preserved for appellate court is reviewed *de novo*. *United States v. Mackins*, 315 F.3d 399 (2006). On appeal, the court "must reverse unless we find this constitutional error harmless beyond a reasonable doubt, with the Government bearing the burden of proving harmlessness." Id. At 405.

B.    ARGUMENT

The issue herein is simple. The Supreme Court over and over again, most recently in *Alleyne v. United States*, 133 S. Ct. 2151, 2155 (2013), has held that "[a]ny fact that, by law, increases the penalty for a crime is an "element" that must

28

be submitted to the jury and found beyond a reasonable doubt. Mandatory minimum sentences increase the penalty for a crime. It follows, then, that any fact that increases the mandatory minimum is an "element" that must be submitted to the jury."

Here, as stated above, the jury found 2200 pounds. This is **less than** the amount under 21 U.S.C. § 841, which requires "a term of imprisonment which may not be less than 10 years or more than life." It matters not that the jury *could have* found "1000 kilograms or more of a mixture or substance containing a detectable amount of marijuana." Id. Nor that the district court could or did find it at sentencing. It must be found by a jury - - and it was not.

Trial counsel, in stating that "if that's a correct statement of the law, we have nothing additional," preserved the objection. (J.A. 1693). The Government in closing argued that the jury should find an amount less than that required by 21 U.S.C. § 841. The jury's verdict form and in its pronouncement in open court found an amount less than that required for a possible life sentence under 21 U.S.C. § 841. Accordingly, the sentence for Count 1 of the indictment must be reversed.

## CONCLUSION

For the reasons set out above, Appellant respectfully requests that this Honorable Court reverse the conviction in this matter and remand for a New Trial in this matter. Appellant requests oral argument.

## REQUEST FOR ORAL ARGUMENT

Appellant requests oral argument on the matters presented in this appeal.

Respectfully submitted,

*/s/ Gary E. Proctor*
Gary E. Proctor
LAW OFFICES OF GARY E. PROCTOR
8 East Mulberry Street
Baltimore, Maryland 21202
(410) 444-1500 Telephone
Gary_proctor@verizon.net

# CERTIFICATE OF COMPLIANCE

This brief has been prepared using a proportionally spaced font: Microsoft Word 2010, Times New Roman, 14 point.

EXCLUSIVE of the table of contents; table of citations; statement with respect to oral argument; and any addendum containing statutes, rule or regulations and the certificate of service the reply brief contains:

<u>7, 139 Words</u>.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions. If the Court so directs, I will provide an electronic version of the Brief and/or a copy of the word or line print-out.

<u>*/s/Gary E. Proctor*</u>

GARY E. PROCTOR

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th day of November, 2013, the required copies of the foregoing Opening Brief of Appellant was filed with the Clerk, United States Court of Appeals for the Fourth Circuit via hand delivery and electronically using the Court's CM/ECF system which will send notification of such filing to counsel of record:

> Peter Nothstein
> Assistant United States Attorney
> 4th Floor
> 36 S. Charles Street
> Baltimore MD 21202

> */s/Gary E. Proctor*
> GARY E. PROCTOR